1  PATRICIA NICELY KOPF (CSB No. 93250)
   PATRICK E. PREMO (CSB No. 184915)
2  FENWICK & WEST LLP
   Two Palo Alto Square
3  Palo Alto, CA 94306
   Telephone:  (650) 494-0600
4  Facsimile:  (650) 494-1417

5  Attorneys for Plaintiff
   SunUp Design Systems, Inc.

FILED
2001 AUG 31 PM 3: 51

Regina Guillermo

ORIGINAL

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SANTA CLARA

SUNUP DESIGN SYSTEMS, INC.

Plaintiff,

v.

ECHOSTAR SATELLITE CORPORATION, a Colorado corporation, and DOES 1 through 20, inclusive,

Defendants.

Case No. **CV801155**

COMPLAINT FOR BREACH OF CONTRACT, BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, INDEBITATUS ASSUMPSIT, QUANTUM MERUIT, INTENTIONAL AND NEGLIGENT MISREPRESENTATION, AND UNFAIR BUSINESS PRACTICES IN VIOLATION OF CAL. BUS. & PROF. C. § 17200

[JURY TRIAL DEMANDED]

Plaintiff SunUp Design System, Inc. ("SunUp") for its Complaint against defendant, EchoStar Satellite Corporation ("EchoStar"), alleges as follows:

## INTRODUCTION

1. After many months of negotiations, EchoStar executed a Memorandum of Startup ("MOS") agreeing to pay SunUp more than $1.39 million for the procurement, development and installation of SunUp's highly sophisticated application software used for television satellite broadcasting. The MOS obligated EchoStar to negotiate and execute in good faith a final definitive agreement, which would identify in greater detail the terms of sale. Nearly six months after the MOS was signed with the project essentially completed, EchoStar attempted to repudiate the deal by unilaterally canceling the project and refusing to sign the final agreement. As a result, SunUp has been left with losses of more than $1 million in unpaid engineering

COMPLAINT FOR BREACH OF CONTRACT, BAD FAITH
AND RELATED CLAIMS

services as well as costs incurred in completing the design, development and testing phases of the EchoStar project.

## PARTIES

2. SunUp is a privately held software company formed in or about April 1992 with its principal place of business in San Jose, California. One of SunUp's premier products is the Traffic and Control System ("TCS Software"), which provides full control of scheduling, plant resources, and content/contract management to handle a large number of channels for pay television satellite broadcasting networks.

3. Based on information and belief, EchoStar Satellite Corporation is a subsidiary of EchoStar Communications, one of the largest satellite broadcasting companies in the country. EchoStar is organized and exists under the laws of the State of Colorado. It has its principal place of business in Englewood, Colorado. Based on information and belief, EchoStar Satellite Corporation (hereinafter "EchoStar") was established to build, launch and operate Direct Broadcast Satellites (DBS) for EchoStar Communications. EchoStar also provides program origination, packaging, and broadcasting of video services in the United States and Canada. SunUp is informed and believes that EchoStar Communications and its subsidiaries deliver DBS television products and services to millions of customers nationwide.

## VENUE

4. Venue is proper in Santa Clara County because among other things SunUp's principal place of business is located in Santa Clara County. In addition, SunUp and EchoStar negotiated the terms of the MOS primarily at SunUp's offices in Santa Clara County. The MOS was later executed in on or about November 29, 2000 in Santa Clara County. Between December 2000 and March 2001, EchoStar representatives traveled to SunUp's offices to participate in user group meetings, design presentations and demonstrations of the TCS Software. SunUp was to perform, and did perform, all the design, development and testing of the TCS Software for EchoStar within Santa Clara County.

///

///

COMPLAINT FOR BREACH OF CONTRACT, BAD FAITH
AND RELATED CLAIMS

- 2 -

## GENERAL ALLEGATIONS

5.  In or about July 2000, EchoStar contacted SunUp and initiated negotiations for purchasing a license of the TCS Software. Between July and November 2000, SunUp met with EchoStar representatives on numerous occasions to discuss requirements for EchoStar users and to prepare the detailed Traffic and Control System Proposal. The Proposal included the EchoStar TCS Workflows and Requirements for PPV/BTV dated November 14, 2000, the Response to Requirements Matrix dated November 20, 2000, the EchoStar TCS System & Project Details dated November 20, 2000, and the TCS Pricing Proposal dated November 20, 2000.

6.  On November 29, 2000, SunUp and EchoStar entered into the MOS for "the procurement, installation, testing, and maintenance" of the TCS Software.

7.  Pursuant to the Agreement, SunUp was to develop and customize for EchoStar the TCS Software, a high performance digital and electronic traffic control and scheduling system in exchange for payment of $1,392,200.

8.  On or about December 8, 2000, SunUp received a purchase order from EchoStar in the sum of $1,392,200 confirming its agreement to move ahead with the project. Attached hereto as Exhibit A and incorporated by reference is the EchoStar purchase order dated December 8, 2000.

9.  EchoStar agreed as part of the MOS to "negotiate in good faith a Definitive Agreement," which would identify the detailed terms for licensing the TCS Software and for performance by SunUp in customizing and providing maintenance for the TCS Software (the "Definitive Agreement"). The parties were obligated under the MOS to execute the Definitive Agreement on or before January 12, 2001 unless they mutually agreed to extend the deadline.

10. SunUp was further obligated to "immediately commence the performance of the design and development activities," so that EchoStar's TCS Software project would be completed in accordance with the scheduled timeline. SunUp fully complied with this obligation and was prepared to install the TCS Software by the beginning of April 2001.

11. EchoStar failed to meet its deadline of January 12, 2001 to execute the Definitive Agreement. SunUp agreed to a brief extension until February 6, 2001 to complete negotiations.

EchoStar failed to meet this deadline as well. During this time, EchoStar continually and repeatedly urging SunUp to continue performance on the TCS Software project despite the absence of the contemplated Definitive Agreement.

12. By the end of March 2001, the parties had fully negotiated all the terms and agreed upon the form of the Definitive Agreement.

13. Based on representations from EchoStar personnel, including the project manager, Jay Pietens, SunUp continued working to customize the TCS Software as though it were performing under the Definitive Agreement. It finished the Critical Design Review, which was approved and accepted by EchoStar on or about March 21, 2001. SunUp also completed two demonstrations of the TCS Software to representatives from EchoStar's user groups and incorporated the feedback in further development of the Software.

14. SunUp was prepared to deliver and install the Software at EchoStar's facility when it received an email message from Pietens on or about April 27, 2001 that: "[T]he project has been place [sic] on hold. I have been reassigned on another project here, at least for the immediate future. I'm afraid I can't really tell you more than that."

15. By letter dated May 15, 2001, EchoStar notified SunUp of EchoStar's repudiation of its obligations under the MOS. EchoStar said merely that it had "elected not to continue the Traffic and Control System program." It failed to include any reason for its termination of the MOS and TCS project. Attached hereto as Exhibit B and incorporated by reference is a true and correct copy of EchoStar's letter dated May 15, 2001.

16. In written communications dated May 30 and July 25, 2001, SunUp contacted EchoStar with offers to resolve any disputes between the parties. EchoStar had made initial payments for a total of $240,000 following execution of the MOS. SunUp sought payments for the remaining unpaid balance of the contract price, or repayment for the approximately 152.5 man weeks of custom engineering services performed since July 2000 for EchoStar's exclusive benefit.

///

///

17. SunUp made many other attempts to contact the key representatives at EchoStar to address any concerns and to obtain compensation for work performed. SunUp's efforts were either ignored or rebuffed.

### FIRST CAUSE OF ACTION
### (BREACH OF CONTRACT)

18. SunUp realleges each and every allegation set forth in Paragraphs 1 through 17, inclusive, and incorporates them by reference herein.

19. On or about November 29, 2000, SunUp and EchoStar executed the MOS for procurement and installation of TCS software for EchoStar in exchange for payment of $1,392,200. EchoStar immediately sent a purchase order dated December 8, 2000 confirming its agreement to purchase the Software.

20. Pursuant to the MOS, EchoStar agreed "to negotiate in good faith a Definitive Agreement for the licensing to Customer of the TCS software and for the performance by SunUp of certain services for the customization of the TCS Software." The deadline for executing the Definitive Agreement would be on or before January 12, 2001, as set forth at paragraph 1.3 of the MOS. EchoStar further agreed at paragraph 17.5 that it would not "unreasonably withhold any of the acceptances or approvals required by this MOS or the Definitive Agreement."

21. EchoStar failed to meet the initial deadline or the extended deadline for executing the Definitive Agreement. Meanwhile, as required by the MOS, SunUp immediately commenced work on customizing the TCS Software for EchoStar. When SunUp expressed concern that the Definitive Agreement was not signed yet, EchoStar insisted that SunUp continue working on the project as if a Definitive Agreement had been executed.

22. By March 2001, SunUp had completed, among other things, the critical design review and two demonstrations. SunUp had also engaged in detailed discussions with EchoStar's IT department for the installation of the TCS Software and to identify the hardware needed. By the end of March 2001, the parties ultimately agreed upon the terms of the Definitive Agreement, but EchoStar refused to sign the final Agreement.

///

23. By email dated April 27, 2001, SunUp was told by the EchoStar project manager, Pietens, that the TCS Software project was "on hold." EchoStar sent a written notice dated May 15, 2001 confirming that it was "electing" not to continue the project. By that time, SunUp had essentially completed the customization and development for EchoStar. It had already expended approximately 152.5 man weeks in engineering services, incurred the bulk of the costs identified for the project, and was prepared to travel to Colorado for final installation.

24. The MOS expressly limits the grounds upon which EchoStar may terminate the Agreement:

> "13.2. **Termination by Customer**. Customer may terminate this MOS and the Definitive Agreement at any time in the event that SunUp breaches any material term or condition of this MOS or the Definitive Agreement and fails to cure such breach within thirty (30) days following notice of such breach."

> "14 **NOTICES**. All communications and notices shall be sent by certified mail, postage prepaid (effective three (3) days after mailing) or by nationally recognized express courier (effective the next business day) or delivered personally or by confirmed fax (each effective upon delivery) to the respective addresses set forth below, or to such other addresses as either party shall designate by notice given as stated herein."

25. SunUp has performed all obligations to EchoStar as required under the agreement, except those obligations SunUp was prevented or excused from performing. EchoStar has not alleged that SunUp has breached the MOS.

26. EchoStar has breached the agreement in the following ways:

(a) By failing to negotiate and execute in good faith a Definitive Agreement by the original deadline of January 12, 2001, or by the extended deadline of February 6, 2001, in violation of paragraph 1.3;

(b) By unreasonably and unjustifiably refusing to sign the final Definitive Agreement after the terms had been fully negotiated and agreed upon in violation of paragraph 17.5;

(c) By unreasonably and unjustifiably terminating the MOS without cause in violation of paragraph 13.2;

///

(d) By failing to notify SunUp of any alleged breach of any material term or condition of the MOS as required by paragraph 13.2; and

(e) By preventing SunUp from attempting to cure any alleged breach in violation of paragraph 13.2.

27. Each of the allegations identified in paragraph 19 constitutes a separate and distinct breach, which gives rise to separate claims for damages.

28. EchoStar has paid approximately $240,000 of the contract price, but refuses to pay the remaining $1,152,200 on the contract price despite numerous demands by SunUp.

29. As a direct and proximate result of the aforementioned acts of EchoStar, SunUp has been damaged in an amount to be proven at trial, but in a sum of at least $1,152,200 or alternatively for the reasonable value of the services performed and costs incurred.

## SECOND CAUSE OF ACTION
## (BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING)

30. SunUp realleges each and every allegation set forth in Paragraphs 1 through 29, inclusive, and incorporates them by reference herein.

31. On or about November 29, 2000, EchoStar expressly confirmed in the MOS that it intended "to negotiate in good faith a Definitive Agreement for the licensing of the TCS Software and for the performance by SunUp of certain services for the customization of the TCS Software in connection with the Proposal..."

32. California law also implies in every contract an implied covenant of good faith and fair dealing upon each party to the contract that neither party will engage in conduct to deny to the other the benefits of the contract.

33. EchoStar has acted in bad faith for the reasons set forth above including by:

(a) Failing to meet the deadline for negotiating in good faith a Definitive Agreement called for under the MOS;

(b) Insisting that SunUp continue work on the project despite SunUp's stated concerns that it did not want to continue the project without the Definitive Agreement;

(c) Refusing to sign the Definitive Agreement after all of the terms were fully negotiated and agreed upon;

(d) Cancelling the project on or about May 15, 2001 after SunUp had essentially completed the project, except for final installation; and

(e) Issuing acceptance on work completed to date and then repudiating the acceptance when SunUp attempted to seek compensation.

34. By reason of these and other acts set forth above, EchoStar has acted in bad faith and has breached the implied covenant of good faith and fair dealing under the common law.

35. As a result of the foregoing, SunUp has suffered damages in an amount to be proven at trial, but in a sum of at least $1,152,200 or alternatively for the reasonable value of the services performed and costs incurred.

## THIRD CAUSE OF ACTION
## (INDEBITATUS ASSUMPSIT)

36. SunUp realleges each and every allegation set forth in Paragraphs 1 through 17, inclusive, and incorporates them by reference herein.

37. On or about November 29, 2000, EchoStar became indebted to SunUp in the agreed sum of $1,392,200 for work, labor and services performed by SunUp engineers at EchoStar's request. EchoStar also became indebted to SunUp for additional costs incurred by SunUp in furnishing the work, labor and services.

38. SunUp has repeatedly demanded payment for the work performed as well as the costs incurred by SunUp. The last demand was made on July 25, 2001.

39. EchoStar has only paid the sum of $240,000 to SunUp, leaving a balance due of $1,152,200, with interest on that amount at the rate of ten percent (10%) per year beginning on May 15, 2001, which is the date EchoStar notified SunUp that it would be discontinuing the TCS project.

## FOURTH CAUSE OF ACTION
## (QUANTUM MERUIT)

40. SunUp realleges each and every allegation set forth in Paragraphs 1 through 17, inclusive, and incorporates them by reference herein.

COMPLAINT FOR BREACH OF CONTRACT, BAD FAITH
AND RELATED CLAIMS

- 8 -

41. From July 2000 and continuing until on or about May 15, 2001, SunUp performed approximately 152.5 man weeks of custom engineering services for EchoStar at EchoStar's request. EchoStar knew these services were being provided, actively participated in the testing, demonstration and implementation of the TCS Software project, and promised to pay the reasonable value of the services.

42. SunUp has repeatedly demanded payment for the work performed as well as the costs incurred by SunUp. The last demand was made on July 25, 2001.

43. SunUp typically charges $10,000 per week for custom engineering (as shown in the Traffic and Control System Proposal included as part of the MOS). The fair and reasonable value of the services performed and costs incurred therefore is $1,525,000.

44. EchoStar has only paid the sum of $240,000 to SunUp, leaving a balance due of $1,285,000, with interest on that amount at the rate of ten percent (10%) per year beginning on May 15, 2001, which is the date EchoStar notified SunUp that it would be discontinuing the TCS project.

## FIFTH CAUSE OF ACTION
## (INTENTIONAL MISREPRESENTATION)

45. SunUp realleges each and every allegation set forth in Paragraphs 1 through 35, inclusive, and incorporates them by reference herein.

46. Between July 2000 and April 2001, EchoStar made false representations of material fact and concealed material information from SunUp through communications by among others, David Kummer, Dick Johnson, Kranti Kilaru and Jay Pietens, the EchoStar personnel responsible for procuring the TCS Software. Specifically, and among other things, SunUp is informed and believes, and thereon alleges that:

    (a) EchoStar made false representations that it would pay for the TCS Software that SunUp was working to customize for EchoStar's benefit; and

    (b) EchoStar made false representations and concealed material information during the negotiation of the Definitive Agreement to induce SunUp to

COMPLAINT FOR BREACH OF CONTRACT, BAD FAITH AND RELATED CLAIMS    - 9 -

continue work on the TCS Software project without the benefit of the executed Definitive Agreement.

47. SunUp is informed and believes, and thereon alleges, that Kummer, Johnson, Kilaru and Pietens, who made the representations herein alleged, are employees of EchoStar and, at the time of the making of the representations herein alleged and at all times herein mentioned were acting within the course and scope of their employment and authority for EchoStar.

48. When EchoStar made these representations, it knew them to be false and made these representations with the intention to deceive and defraud SunUp and to induce SunUp to act in reliance on these representations in the manner hereafter alleged, or with the expectation that SunUp would so act.

49. SunUp, at the time these representations were made by EchoStar and at the time SunUp took the actions herein alleged, was ignorant of the falsity of EchoStar's representations and believed them to be true. In reliance on these representations, SunUp was induced to and did continue to perform work and provide engineering services to EchoStar. SunUp also reasonably and justifiably relied on the representations and concealment by continuing to work even though EchoStar had not signed the formal Definitive Agreement. Had SunUp known the actual facts, it would not have taken such action.

50. As a direct and proximate result of EchoStar's fraudulent conduct as herein alleged, SunUp was induced to spend nearly ten months providing custom engineering services on a software project that cannot be used for any other customer. SunUp has also incurred direct costs in preparing the requirement specifications, meeting with EchoStar user groups to understand EchoStar requirements, and hiring four new engineers to work full-time on the EchoStar project. SunUp has incurred further economic loss in an amount to be determined at trial by deferring or delaying work for other projects with other customers and potential customers. Other than initial payments of $240,000, SunUp has not received any compensation for its work and time, by reason of which SunUp has been damaged in the sum of at least $1,285,000.

COMPLAINT FOR BREACH OF CONTRACT, BAD FAITH AND RELATED CLAIMS

- 10 -

51. SunUp is informed and believes, on that basis alleges, that the aforementioned misrepresentations and concealment of information by EchoStar were made with fraudulent and malicious intent to harm and injure SunUp and with the conscious disregard for the reasonably foreseeable injuries that SunUp would suffer as a consequence thereof. Said conduct of EchoStar was done willfully, maliciously and in conscious disregard of SunUp's rights, thereby entitling SunUp to an award of punitive damages in an amount sufficient to punish and make an example of EchoStar, in an amount that will be proven at trial.

### SIXTH CAUSE OF ACTION
### (NEGLIGENT MISREPRESENTATION)

52. SunUp realleges each and every allegation set forth in Paragraphs 1 through 35, inclusive, and Paragraph 46, and incorporates them by reference herein.

53. The aforementioned misrepresentations identified in paragraph 46 herein were material to SunUp's decision to continue working on the TCS project for EchoStar.

54. SunUp is informed and believes, and on that basis alleges, that EchoStar was well aware that the misrepresentations were false or incorrect, or in the exercise of reasonable care, should have been aware that the aforementioned misrepresentations were false or incorrect and would lead SunUp to rely on them by encouraging SunUp to continue working on the TCS project, while unreasonably delaying the signing of the formal Definitive Agreement. EchoStar made such misrepresentations without reasonable grounds to believe them to be true.

55. SunUp, at the time these representations were made by EchoStar and at the time SunUp took the actions herein alleged, was ignorant of the falsity of EchoStar's representations and believed them to be true. In reliance on these representations, SunUp was induced to and did continue working on the TCS project for EchoStar. SunUp also reasonably and justifiably relied on the representations by refraining from accepting projects for other customers or potential customers of SunUp. Had SunUp known the actual facts, it would not have taken such action.

56. As a direct and proximate result of EchoStar's fraudulent conduct as herein alleged, SunUp was induced to spend nearly ten months providing custom engineering services on a software project that cannot be used for any other customer. SunUp has also incurred direct

costs in preparing the requirement specifications, meeting with EchoStar user groups to understand EchoStar requirements, and hiring four new engineers to work fulltime on the EchoStar project. SunUp has incurred further economic loss in an amount to be determined at trial by deferring or delaying work for other projects with other customers and potential customers. Other than initial payments of $240,000, SunUp has not received any compensation for its work and time, by reason of which SunUp has been damaged in the sum of at least $1,285,000.

## SEVENTH CAUSE OF ACTION
## UNFAIR BUSINESS PRACTICES (BUS. & PROF. C. § 17200)

57.  SunUp realleges each and every allegation set forth in Paragraphs 1 through 56, inclusive, and incorporates them by reference herein.

58.  The conduct of EchoStar as alleged herein constitutes unlawful and unfair business practices within the meaning of Cal. Bus. & Prof. Code § 17200, et seq.

59.  As a direct and proximate result of the aforementioned unlawful and unfair business acts of EchoStar, SunUp has suffered irreparable harm and damage and will continue to suffer further damage, including damage to its business, reputation and goodwill, and damages from the loss of compensation for services performed by SunUp engineers for EchoStar, and other harm, entitling SunUp to restitution as well as disgorgement of any benefit gained by EchoStar as a result of its unlawful and unfair activities.

WHEREFORE, plaintiff SunUp prays for judgment against defendant EchoStar as follows:

A.  On the First through Third Causes of Action, that SunUp be awarded compensatory damages in an amount to be proven at trial, but in a sum of at least $1,152,200;

B.  On the Fourth through Sixth Cause of Action, that SunUp be awarded compensatory damages in an amount to be proven at trial, but in a sum of at least $1,285,000;

C.  On the Fifth Cause of Action, that SunUp be awarded punitive damages in an amount necessary to punish EchoStar;

1      D.    On the Seventh Cause of Action, that the EchoStar be ordered to account for,
2  disgorge and pay to SunUp any and all unjust enrichment derived by EchoStar from the aforesaid
3  violations of Cal. Bus. & Prof. Code §§ 17200 et seq.;
4      E.    That SunUp be awarded prejudgment and post-judgment interest at the legal rate;
5      F.    That SunUp be awarded attorneys' fees and costs of suit; and
6      G.    That SunUp be awarded such other relief as the Court deems just and proper.

7  DATED: August 31, 2001        FENWICK & WEST LLP

9  By: _____
10 Patrick E. Premo
    Attorneys for Plaintiff
11 SunUp Design System, Inc.

12                                                    20650/00400/LIT/1103860.1

- 13 -

Complaint for Breach of Contract, Bad Faith and Related Claims

# HTS
**Hitachi Design Systems**

| | |
|---|---|
| **VENDOR:** HITACHI DESIGN SYSTEM INC<br>101 METRO DR<br>STE 500<br>SAN JOSE, CA 95110<br>United States<br>Telephone: 408-437-6500<br>Fax: 408-437-6431   Currency: USD | **SHIP TO:**<br>94 INVERNESS TERRACE EAST<br>ENGLEWOOD, CO 80112<br>United States<br><br>**BILL TO:**<br>CORPORATE ACCOUNTS PAYABLE<br>PO BOX 9021<br>LITTLETON, CO 80120-9021<br>United States<br>CONTACT PHONE: (303) 799-6222 |

**PURCHASE ORDER**

| Purchase Order | Rev | Page |
|---|---|---|
| R00-104517 | 1 | 1 of 1 |

| DATE OF ORDER | BUYER |
|---|---|
| 06-DEC-00 | J ROSS |
| DATE OF REV | BUYER |
| 18-DEC-00 | J ROSS |

| FREIGHT TERMS | FOB |
|---|---|
| SEE NOTE | ORIGIN |
| PPD & ADD | |

SHIP VIA: BESTWAY

Vendor Tax Id:

Requestor: AGUILAR, LAURA

Vendor Contact: [signature] Delivery Date Wet

| Line | Item Number / Description | Qty | UOM | Unit Price | Extended |
|---|---|---|---|---|---|
| 1 | EST/REV TRAFFIC & SCHEDULING SYSTEM PER<br>NUMBER 19,200 PROPOSAL NBR ACRO-01-00 DATED<br>12/6/00<br>*PAYMENT TERMS: NET 30. NET 15 FOR 1ST PAYMENT.<br>DELIVER TO: AGUILAR, LAURA (3.0%) | 1 | EACH | 1,392,200.00 | 1,392,200.00 Y |

[signature]
AUTHORIZED SIGNATURE
303-706-[illegible]



ECHOSTAR COMMUNICATIONS CORPORATION

May 15, 2001

Praveen Sharma
President & CEO
SunUp Design Systems, Inc.
181 Metro Drive
Suite 600
San Jose, CA 95110

Dear Praveen-

This letter is to inform you that EchoStar Satellite Corporation ("EchoStar") has elected not to continue the Traffic and Control System program. EchoStar has completed a thorough analysis of the proposed system with various teams in the company and has concluded against pursuing execution of a Definitive Agreement with SunUp Design Systems, Inc. I sincerely thank you for the work you and your team have provided in response to the MOS we had executed last year.

Please feel free to contact me if you have any questions.

Sincerely,

Dave Kummer
Senior Vice President of Engineering & Systems
EchoStar Technologies Corporation
94 Inverness Circle East
Englewood, CO 80112
Telephone: 303-706-5360
Fax: 303-706-3901

90 Inverness Circle East · P.O. Box 6552 · Englewood, CO 80155 · Tel: (303) 799-8222 · Fax: (303) 799-6222